UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
(At Lexington)

| | | |
|---|---|---|
| JILL GERLACH, | ) | |
| | ) | Civil Action No. 5:20-CV-297-CHB |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| SIEMENS CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on Defendant Siemens Corporation's Motion for Summary Judgment, [R. 18]. Plaintiff Jill Gerlach filed a Response, [R. 19]. Siemens filed a Reply, [R. 24]. This matter is now ripe for review. For the reasons stated below, Siemens' Motion for Summary Judgment will be granted.

I.   **Background**

Gerlach began working for Siemens full time in March 2011. [R. 18–2, 15:17–21]. She worked as an Employee and Leadership Communications Manager, and her most recent job title was "Employee Engagement Leader." *Id.* at 12:3–9. Gerlach's position required her to work in the Atlanta, Georgia, area. *Id.* at 15:22 to 16:8. Gerlach was supervised by Katherine "Katie" Ferris, the head of communications for Siemens Smart Infrastructure. [R. 18–4, p. 3, 8:9–11]. In April 2019, Gerlach emailed Ferris a request to work remotely from Kentucky, where she was located at the time for "safety"[1] reasons. [R. 18–2, 71:3–9]. Ferris denied Gerlach's request via email on May 1, 2019, stating that the success of Gerlach's role depended on her location in Atlanta. *Id.* at 71:10–15; [R. 18–2, Ex. 2, Siemens–001748]. Gerlach was asked to inform Ferris,

---

[1] Gerlach fled to Kentucky after a confrontation with her now ex-husband. [R. 18–2, 72:9–12].

by May 6th, if she believed she would not be able to meet the expectation that she be present in Georgia. [R. 18–2, Ex. 2, Siemens–001748]. Ferris explained that "[i]n essence, this would mean that you are voluntarily resigning from your position." *Id.* In her response email, Gerlach expressed she did "not wish to resign from [her] position" and that she would "work things out on [her] end to be present in the [Georgia] offices." *Id.*

As of April and May 2019, prior to the time Gerlach requested FMLA leave, "friction" existed between Gerlach and Ferris. [R. 18–2, 82:7–10]. Gerlach believed that Ferris was giving her unrealistic amounts of work. *Id.* at 81:22 to 82:1. Interactions between the two women could have been perceived as "inappropriate and rude" to "an outsider." *Id.* at 274:23 to 275:13. In an employee review, Ferris expressed her frustrations with the lack of connection between her and Gerlach. [R. 19–8]. Ferris also mentioned that "on several occasions, [Gerlach's] responses to me were not professional or respectful." *Id.* Ferris publicly corrected Gerlach when she deemed her responses to be unacceptable in the presence of "other employee engagement team members." *Id.*; [R. 18–2, 357:1–4].

On June 21, 2019, Gerlach completed her last day of work at Siemens. [R. 18–2, 41:1–15]. Subsequently, she took paid time off[2] until July 1, 2019, when her Family Medical Leave Act ("FMLA") leave began. *Id.* at 23:20 to 24:16. Gerlach took FMLA leave because she was "physically unable to work" due to a violent altercation with her now ex-husband on June 30, 2019. *Id.* at 41:23 to 42:22. In mid–July, Lincoln Financial ("Lincoln"), Siemens' leave administrator, sent Gerlach a letter, explaining her FMLA rights and responsibilities. *Id.* at 105:11–13; [R. 18–2, Ex. 5, Siemens–001514 to 001517]. According to the letter, Gerlach had "480 hours of unpaid leave remaining under the [FMLA] for the current 12

---

[2] Gerlach had a planned vacation to visit her mother, who was ill with cancer, in Kentucky. [R. 18–2, 25:4–13].

2

month period." *Id.* In addition, the letter stated that to return to work after leave, Gerlach must provide Lincoln with a "return to work" date and "a release to return to work from [her] treating provider." *Id.* at 001517. Gerlach knew of these requirements because she had successfully taken FMLA leave in 2016. [R. 18–2, 206:9–20; 212:12 to 214:17].

Gerlach submitted a "Certification of Health Care Provider" form, which stated that she would be absent from work until June 30, 2020. [R. 18–2, Ex. 6, Siemens–001333 to 001335]. Gerlach used all her FMLA leave continuously, meaning she did not return to work prior to the expiration of the designated 480 hours. [R. 18–2, 283:21 to 284:19]. Simultaneously, Gerlach received short-term disability until November 22, 2019, at which time she sought long-term disability. *Id.* at 37:22 to 39:6; 40:1–13. A letter from Lincoln, dated November 1, 2019, informed Gerlach that she "used all available [FMLA] leave entitlement as of September 20, 2019. [R. 18–2, Ex. 14, Siemens–001509].

At the end of her FMLA leave, Gerlach was not released by her physicians to return to work. [R. 18–2, 303:19–25]. Gerlach testified that she remained disabled. *Id.* at 47:10–21. Consequently, she never submitted a "return to work" date or medical release form to Lincoln, as required by company policy. *Id.* at 206:9–20; 208:8–11; 218:23 to 219:4. Instead, Gerlach's physicians supplied Lincoln with information to support Gerlach's claim for long-term disability. *Id.* at 48:21 to 49:23. In October 2019, for the second time, Gerlach requested that she be able to work remotely from Kentucky. *Id.* at 52:6 to 54:6. Her request was denied. *Id.* at 53:23 to 54:2. As a response to Gerlach's pursuit of long-term disability, Siemens–via a letter dated November 15, 2019–granted Gerlach an additional five months of unpaid[3] leave. [R. 18–2, Ex. 26,

---

[3] Despite being on unpaid leave, by administrative error, Gerlach received her full paycheck from January 2020 to May 2020. Gerlach reimbursed Siemens for the wrongfully received funds. [R. 18-1, p. 9; R. 18, Ex. 27, Siemens–001747; R. 18–2, 223:12–19].

3

Siemens–001745]. However, the letter also informed Gerlach that Siemens was unable "to continue to hold [her] position" and encouraged Gerlach to apply for "vacant positions" when she was released to return to work. *Id.* Gerlach also received a bonus for her 2019 performance. [R. 18–4, p. 12, 44:2–4].

Gerlach never applied for another position at Siemens during 2019 or 2020. [R. 18–2, 302:18 to 303:14]. On May 12, 2020, Gerlach received a letter from Siemens, informing her that her "employment will end effective May 12, 2020." *Id.* at 189:6–22; [R. 18–2, Ex. 27, Siemens–001747]. Prior to this termination date, however, Gerlach accepted employment at the Lexington Clinic on March 16, 2020. [R. 18–2, 248:22 to 249:7]. At no point did Gerlach submit to Lincoln or Siemens a "return to work" date or medical release form. *Id.* at 206:9–20; 208:8–11; 218:23 to 219:4.

Gerlach filed suit in Fayette Circuit Court on July 10, 2020, claiming one count of retaliation in violation of the FMLA. [R. 1–1]. Specifically, Gerlach argues that her employment at Siemens was terminated because she exercised her rights under FMLA and that she was retaliated against when Siemens did not allow her to work remotely following her FMLA leave *Id.* at 2–3, ¶¶ 11–15, 21–25. Siemens filed a Notice of Removal, requesting the case be removed to the United States District Court for the Eastern District of Kentucky. [R. 1]. Subsequently, Siemens filed a Motion for Summary Judgment, [R. 18].

## II.     Standard of Review

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When determining a motion for summary judgment, the Court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party.

4

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). The Court may not "weigh evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 265 (1986). The Court "need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

The initial burden of establishing no genuine dispute of material fact rests with the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies this burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Id.* at 324. When, as here, the defendant moves for summary judgment, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. Where "a party fails to support an assertion of fact or fails to properly address another party's assertion of fact," the Court may treat the fact as undisputed. FED. R. CIV. P. 56(e)(2). A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson*, 477 U.S. at 248. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249.

### III. Analysis

The FMLA provides covered employees a total of twelve workweeks of leave upon, among other things, the occurrence of a "serious health condition that makes the employee unable to perform the functions of [her] position." 29 U.S.C. § 2612(a)(1)(D). A "serious health

5

condition" is defined as an "illness, injury, impairment, or physical or mental condition" that requires either inpatient care at a hospital or facility or "continuing treatment by a health care provider." 29 U.S.C. § 2611(11). An employee who utilizes FMLA leave is entitled to be restored to her position, or an equivalent one, when she returns from leave. 29 U.S.C. § 2614(a)(1). It is unlawful for any employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right" guaranteed by the FMLA. 29 U.S.C. § 2615(a)(1). Further, it is unlawful for any employer to "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA. 29 U.S.C. § 2615(a)(2). An aggrieved employee may sue to enforce her FMLA rights on one of two theories: entitlement (or interference) or retaliation (or discrimination). *Hunter v. Valley View Local Sch.*, 579 F.3d 688, 691 (6th Cir. 2009); *see also* 29 U.S.C. § 2617.

When a FMLA retaliation claim is based on indirect evidence, as it is here, the *McDonell Douglas* burden–shifting analysis applies. *Labelle v. Cleveland Cliffs, Inc.*, 784 F. App'x 437, 443 (6th Cir. 2019) (citing *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006)) ("This court applies the familiar burden–shifting test articulated in *McDonnell Douglas* … to retaliation claims under the FMLA."); *see generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). If the employee establishes a prima facie case of retaliation, she raises a presumption of discrimination. *Id.* (citation omitted). The burden then shifts to the employer to "articulate a non-discriminatory basis for the adverse action and thus rebut the presumption." *Id.* If the employer does so successfully, the burden shifts back to the employee to show that the employer's justification is pretext for retaliation. *Id.*

### A. Prima Facie Case

6

A prima facie case of FMLA retaliation is established by satisfying the following elements: (1) the plaintiff availed herself of a protected right under the FMLA; (2) her employer knew she was exercising her FMLA rights; (3) after learning of her exercise of FMLA rights, her employer took an adverse employment action; and (4) there was a causal connection between the exercise of the protected right and the adverse employment action. *Nathan v. Great Lakes Water Auth.*, 992 F.3d 557, 573 (6th Cir. 2021) (quoting *Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012)); *see also Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir. 2001) (citation omitted). A plaintiff must prove his or her prima facie case by a preponderance of the evidence. *Ramirez v. Bolster & Jeffries Health Care Grp., LLC*, 277 F. Supp.3d 889, 909 (W.D. Ky. 2017) (citing *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 447 (6th Cir. 2007)).

Here, the first two elements are not at issue. It is undisputed that Gerlach availed herself of the right of FMLA leave and that Siemens knew Gerlach exercised such right. [R. 19, p. 7]. However, even if this Court were to find that the third element was met via Gerlach's termination, Gerlach fails at the fourth element. To establish a causal connection, a plaintiff must "proffer evidence 'sufficient to raise the inference that the protected activity was the likely reason for the adverse action.'" *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997) (quoting *Zanders v. National R.R. Passenger Corp.*, 898 F.2d 1127, 1135 (6th Cir. 1990)). "In determining whether there is a causal relationship between a plaintiff's protected activity and an allegedly retaliatory act, courts may consider whether the employer treated the plaintiff differently from similarly situated individuals and whether there is a temporal connection between the protected activity and the retaliatory action." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 516–17 (6th Cir. 2009).

The Sixth Circuit has "embraced the premise that in certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise." *Bush v. Compass Grp. USA, Inc.*, 683 F. App'x 440, 451 (6th Cir. 2017) (quoting *DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009)); *see also Krumheuer v. GAB Robins N.A., Inc.*, 484 F. App'x 1, 5 (6th Cir. 2012) ("[W]e have concluded that temporal proximity alone is sufficient to establish a prima facie case of FMLA retaliation."). However, the relevant time frame for the Court to "consider in determining whether there is a causal connection between the plaintiff's FMLA leave and the adverse employment action is the 'time after an employer learns of a protected activity,' not the time after the plaintiff's FMLA leave expires." *Bush*, 683 F. App'x at 452 (citations omitted). "The more time that elapses between the protected activity and the adverse employment action, the more the plaintiff must supplement his claim with 'other evidence of retaliatory conduct to establish causality.'" *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010) (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 524–25 (6th Cir. 2008)).

Here, Gerlach claims temporal proximity because Siemens "refused to provide a position for her to return to, effectively terminating her while she was on leave." [R. 19, p. 9]. As a result, "by the latest November 2019, just weeks after [Gerlach] took FMLA leave, [her] employment was doomed." *Id.* However, the Court finds this argument to be off base for two reasons. First, in November 2019, Siemens could not reinstate Gerlach to her previous, or an equivalent, position after her FMLA leave because Gerlach remained disabled, and therefore, could not return to work. [R. 18–2, 303:19–25]. As Susan Whitlock, the Senior Director of Smart Infrastructure,

8

stated in her deposition, "[Gerlach] is unable to work for the company if she's not released to work." [R. 18–3, pp. 5–6, 10:14–16; 14:1–2]. Since Siemens provided Gerlach with an additional five months of unpaid leave due to her continuing disability, it is a misrepresentation to assert that Siemens stripped Gerlach of her position (at any point) and "doomed" her career "by the latest November 2019." *Id.* at 13:13–18; [R. 19, p. 9]; [R. 18–2, Ex. 26, Siemens–001745].

Second, Siemens made no decisions regarding Gerlach's employment while she was on FMLA leave. [R. 18–4, p. 7, 25:9–13]. As stated above, at the expiration of her FMLA leave and short–term disability, Siemens provided Gerlach with an additional five months of unpaid leave. [R. 18–2, Ex. 26, Siemens–001745]. Importantly, Gerlach's termination, the alleged adverse action, did not occur until May 2020, nearly seven months after her FMLA leave expired and almost ten months after Siemens learned of her FMLA leave. [R. 18–2, Ex. 27, Siemens–001747; R. 18–2, Ex. 6, 001333–35]. Thus, Gerlach cannot establish retaliation based on temporal proximity alone. *See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be "very close.") (citation omitted); *see also Stein v. Atlas Indus.*, 730 F. App'x 313, 319 (6th Cir. 2018) (quoting *Breeden*, 532 U.S. at 273) ("How close is 'very close'? … [O]ur cases indicate that the line should be drawn shy of the ten–week mark.).

Gerlach also fails to supplement her claim with other evidence of retaliatory conduct. *Vereecke*, 609 F.3d at 400. In support of her argument, Gerlach cites to *Harrison v. Metro. Gov't*, 80 F.3d 1107 (6th Cir. 1996). [R. 19, pp. 8–9]. In *Harrison*, the court determined that a causal relationship existed between the protected activities and the adverse actions because even

9

though the plaintiff's termination occurred almost one year and three months after the filing of his EEOC charge, additional evidence established causation. *Id.* at 1118–19. The additional evidence consisted of employees refusing to testify at plaintiff's hearing out of fear of retaliation, plaintiff's supervisor's repeat comments that "he would not hesitate to run employees out of his department," and evidence illustrating that "plaintiff's activities were more carefully scrutinized than those of comparably situated employees." *Id.* at 1119.

Gerlach presents no such credible evidence here. At best, she attempts to demonstrate a causal connection by arguing that she was treated "worse than other Siemens' employees" because Ferris permitted Kristen Saenger, another one of her supervisees, to work remotely even though Gerlach was denied the same opportunity. [R. 19, p. 9].[4] *See Barrett*, 556 F.3d at 516–17. However, Gerlach's request to work remotely was denied in May 2019, months *prior* to her FMLA leave and, consequently, there is no causal connection between her FMLA leave and the denial of this request. [R. 18–2, Ex. 2, Siemens–001748].

In any event, despite Gerlach's assertions otherwise, Saenger was not "similarly situated" to Gerlach when she was originally permitted to work remotely. *See Barrett*, 556 F.3d at 516–17. Saenger began working remotely in 2017, two years prior to Siemens' company–wide reorganization, when her role was to manage Siemens' 18–wheeler tour. [R. 18–4, pp. 8–9, 29:16 to 30:7; 32:1–9]. During this time, Saenger travelled throughout the United States and would also occasionally work from Siemens' Orlando office. *Id.* at 9, 32:1–9. When Gerlach requested to work remotely for the first time in April 2019, her role was senior communications specialist,

---

[4] Gerlach's Response also mentions a second employee, Ellen Dowell, who was permitted to work remotely. [R. 19–4, p. 4]. However, in his deposition, Chris Desantis, another supervisee of Ferris, testified that while Dowell worked from home, she also worked from Siemens' Georgia office. [R.19–4, Attach. 4, 25:10–11; 29:4–12]. Further, Gerlach provides no other details about Dowell, her position, or the process in which she obtained work–from–home privileges. Thus, Gerlach's argument regarding Dowell is wholly underdeveloped and the Court will not address it.

employee engagement, and Siemens' company–wide reorganization had already occurred, which was cited as one of the reasons why Siemens required Gerlach to be physically present in the Atlanta area. [R. 18–4, p. 5, 14:22 to 15:6; R. 18–2, Ex. 2, Siemens–001748]. Thus, at the time of her first request, Gerlach's duties were not similar to Saenger's duties (when Saenger first started working from home in 2017).

Saenger's current ability to work remotely, despite her promotion to Gerlach's previous position, senior communications specialist, however, cannot be construed as favored treatment. [R. 19, p. 3]. Gerlach does not provide the Court with any clear timeline as to when Saenger's promotion occurred. [R. 19, p. 3, n. 12]. At best, based on Ferris's deposition, it can be assumed that Saenger was not promoted until after November 2019, months after Gerlach's FMLA leave expired and when she had still not returned to work. [R. 18–4, p. 14, 52:2–20]. The Court is also left in the dark as to whether Saenger's new duties reflect those of Gerlach's when Gerlach requested to work remotely and whether, with her new position, Saenger works remotely full–time or continues to occasionally work in–person at Siemens' Orlando office. To speculate on such matters would be a disservice to the Court. *See Siegner v. Twp. of Salem*, 654 F. App'x 223, 230 (6th Cir. 2016) (noting that "mere personal beliefs, conjecture and speculation" are "insufficient to support an inference of retaliation") (citing *Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 724 (6th Cir. 2006)).

Any reliance by Gerlach on *Moore v. Kuka Welding Sys.*, 171 F.3d 1073 (6th Cir. 1999) is, once again, misplaced. [R. 19, p. 9–10]. In *Moore*, the plaintiff established a causal connection for his Title VII retaliation claim when he presented "sufficient evidence that his isolation was prompted by the filing of his [EEOC] complaint." 171 F.3d at 1080. In addition, the jury considered "separate incidents" that included "more frequent disciplinary writeups of

11

plaintiff for trivial matters and unwarranted criticism of plaintiff's work." *Id.* Here, Gerlach has not provided the Court with any evidence of isolation, unwarranted criticism, or disciplinary writeups. In fact, despite being on leave for a significant portion of 2019, Gerlach received her bonus for 2019. [R. 18–4, p. 12, 44:2–4].

If anything, the Court finds this case to be analogous to *Heidger v. Gander Mt. Co.*, No. 10–13534–BC, 2011 U.S. Dist. LEXIS 93400 (E.D. Mich. Aug. 22, 2011). In *Heidger*, the plaintiff began experiencing numbness in his left hand. 2011 U.S. Dist. LEXIS 93400, at *1. The numbness eventually resulted in the plaintiff being unable to use his left hand, preventing him from performing his job duties as a gunsmith. *Id.* Consequently, plaintiff stopped working in July 2009 and underwent corrective surgery in December 2009. *Id.* at *1–2. By the end of late 2009, plaintiff's employer determined that plaintiff's FMLA leave had expired and began looking for another gunsmith to replace plaintiff. *Id.* at *4. On February 3, 2010, the employer hired a new gunsmith. *Id.* at *5. Ten days later, plaintiff emailed his employer and indicated his desire to return to work. *Id.* On February 15, 2010, plaintiff was cleared by his physician to return to work. *Id.* However, plaintiff was not rehired. *Id.* Subsequently, the plaintiff filed suit, alleging, among other things, retaliation in violation of the FMLA. *Id.* at *2.

The court found that plaintiff failed to establish a prima facie case of retaliation because he could not establish a causal connection between the exercise of his FMLA rights and his termination. *Id.* at *11. The court reasoned:

> Plaintiff began his medical leave on August 1, 2009 and the twelve-week period guaranteed by the statute expired on October 23, 2009. It was only after Plaintiff had still not returned to work three and a half months later that Defendant decided to terminate his employment. Plaintiff's employment was terminated because he had still not come back to work long after the FMLA leave period had expired; not because he took FMLA leave.

*Id.*

The same is true here. Gerlach began her FMLA leave on July 1, 2019, and it expired on September 20, 2019. [R. 18–2, 23:20 to 24:16; R. 18–2, Ex. 14, Siemens–001509]. Siemens terminated Gerlach only after she failed to return to work after an additional five months of unpaid leave. [R. 18–2, Ex. 27, Siemens–001747]. At no point during her FMLA or extended leave did Gerlach submit a "return to work" date or medical release form to Lincoln. [R. 18–2, 206:9–20; 208:8–11; 218:23 to 219:4]. Instead, while on extended leave, Gerlach obtained employment at the Lexington Clinic in Kentucky. *Id.* at 248:22 to 249:7. These facts make it evident that Siemens terminated Gerlach because she never returned to work post–FMLA or extended leave, not because she exercised her rights under the FMLA. Consequently, a causal connection cannot be established, and Gerlach has failed to establish a prima facie case of retaliation.

### B. Siemens' Non-discriminatory Basis

But even assuming Gerlach can show a prima facie case of FMLA retaliation, she must clear the *McDonnell Douglas* burden-shifting test. *See Labelle*, 784 F. App'x at 443. Siemens has provided legitimate reasons as to why its termination of Gerlach was nondiscriminatory. The reasons involve compliance, or lack thereof, with company policies. Siemens' policy requires employees to submit a "return to work" date and a medical release form to Lincoln, its leave administrator, prior to an employee resuming work at the company post–FMLA leave. [R. 18–2, Ex. 5, Siemens–001517]. The evidence is undisputed that Gerlach was aware of this requirement, but nevertheless failed to supply Lincoln with the necessary documents at any point throughout her FMLA or extended leave. [R. 18–2, 206:9–20; 212:12 to 214:17; R. 18–4, p. 4, 11:12–16; R. 18–3, pp. 5, 7, 13:7–22; 19:3–12]. In fact, by the end of her FMLA leave in September 2019, Gerlach's physicians had not cleared her to return to work. *Id.* at 303:19–25.

13

Instead, Gerlach's physicians submitted information to Lincoln in support of Gerlach's pursuit of long-term disability. *Id.* at 48:21 to 49:23. In response, Siemens provided Gerlach with an additional five months of unpaid leave. [R. 18–2, Ex. 26, Siemens–001745; R. 18–3, pp. 5–6, 13:7–22; 14:13–23]. Gerlach's termination did not occur until May 2020, seven months *after* the expiration of Gerlach's FMLA leave, when Lincoln had still not received a "return to work" date and medical release form from Gerlach. [R. 18–2, Ex. 27, Siemens–001747]. Thus, Gerlach's noncompliance with Siemens' policy is a sufficient, nondiscriminatory reason for her termination.

      Furthermore, Siemens' leave policy also states as follows:

> If the employee fails to return to work after the expiration of all available leave, the employee will be considered to have voluntarily terminated employment as of the last day of the approved leave.

[R. 18–2, Ex. 40, Siemens–002229]. On November 15, 2019, Siemens, via letter, informed Gerlach that she was being granted "unpaid personal leave for up to five months." [R. 18–2, Ex. 26, Siemens–001745]. The letter also explicitly invited Gerlach "to apply for vacant positions for which [she] may be qualified" once she was "released to return to work." *Id.* Generally, the five months of unpaid leave would have expired in April 2020. However, Siemens did not terminate Gerlach until May 12, 2020. *Id.* at Ex. 27, Siemens–001747. Gerlach had an additional two months to submit a "return to work" date and medical release form to Lincoln to pursue other employment at Siemens. However, instead of pursuing employment at Siemens, Gerlach accepted a position at the Lexington Clinic in Kentucky on March 16, 2020, while she was still on extended leave with Siemens. [R. 18–2, 248:22 to 249:7; 303:8–14]. Siemens argues Gerlach's lack of "return to work" date and medical release form prevented Gerlach from returning to work for Siemens by the end of her extended leave. Thus, in accordance with the

policy stated above, which Gerlach testified to having reviewed since she was required to do so as an employee of Siemens, Siemens contends Gerlach's failure to return to work at the end of her extended leave constituted voluntary termination. [R. 18–1, p. 13; R. 18–2, 339:22–25]. Accordingly, Siemens has articulated legitimate non–discriminatory reasons for Gerlach's termination. Thus, the burden now shifts to Gerlach to show Siemens' proffered reasons for discharging her were pretextual. *See Labelle*, 784 F. App'x at 443.

### C. Pretext

"Under the law of the circuit, a plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Tingle v. Arbors at Hillard*, 692 F.3d 523, 530 (6th Cir. 2012) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)). These three categories are a "convenient way of marshaling evidence and focusing it on the ultimate inquiry: 'did the employer fire the employee for the stated reason or not?'" *Id.* (citation omitted). To succeed, a plaintiff "must put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Id.* (quoting *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001)).

In her Response, Gerlach neither mentions the above stated law nor directly addresses any one of the three common ways in which pretext can be illustrated. Reviewing the first test for pretext, the Court can discern no argument by Gerlach that the proffered reasons had no basis in fact. Indeed, the facts are undisputed that Gerlach failed (1) to provide a "return to work" date and medical release form to Lincoln, and (2) to return to work at the end of her extended leave.

15

[R. 18–2, 206:9–20, 248:22 to 249:7, 303:8–14; R. 18–4, p. 4, 11:12–16; R. 18–3, pp. 5, 7, 13:7–22; 19:3–12].

Instead, Gerlach seems to argue that Siemens' proffered reasons did not actually motivate its termination decision. First, Gerlach argues that "when [she] asked to be permitted to work remotely from Kentucky in May 2019, months before she took FMLA leave, Ferris did not simply deny [her] request, she pounced on the chance to see if she could coerce [her] into resigning." [R. 19, p. 10]. Upon review of the record, the Court finds Gerlach's statement concerning Ferris to be a mischaracterization of events. In April 2019, Gerlach emailed Ferris a request to work remotely from Kentucky, where she was located at the time for "safety"[5] reasons. [R. 18–2, 71:3–9]. Notably, Ferris denied Gerlach's request via email on May 1, 2019, *before Gerlach even requested FMLA leave*, stating that the success of Gerlach's role depended on her location in Atlanta. *Id.* at 71:10–15; [R. 18–2, Ex. 2, Siemens–001748]. Gerlach was asked to inform Ferris, by May 6th, if she believed she would not be able to meet the expectation that she be present in Georgia. [R. 18–2, Ex. 2, Siemens–001748]. Ferris explained that "[i]n essence, this would mean that you are voluntarily resigning from your position." *Id.* In her response email, Gerlach expressed she did "not wish to resign from [her] position" and that she would "work things out on [her] end to be present in the [Georgia] offices." *Id.* There is nothing in this exchange to support a claim that Ferris "pounced" on a chance to terminate Gerlach or that Ferris engaged in any measure of coercion. [R. 19, p. 10]. Ferris simply stated the consequences that were likely to occur if Gerlach chose to remain in Kentucky at that time. Rather than "pounc[ing]" at the chance to terminate Gerlach, Siemens provided Gerlach with FMLA leave, short–term disability, and then an additional five–plus months of unpaid leave. *Id.*;

---

[5] Gerlach fled to Kentucky after a confrontation with her now ex-husband. [R. 18, Ex. 2, 72:9–12].

16

[R. 18–3, p. 6, 14:13–23]. In addition, Gerlach successfully took FMLA leave in 2016 without any repercussions. [R. 18–2, 212:12 to 214:17; 231:18–21].

Second, Gerlach again argues that Siemens' true motivations in terminating her were unrelated to policy violations and instead were grounded in discrimination, contending that "when [she] went on [FMLA] leave, Ferris began *retroactively* documenting poor performance and disrespectful actions on [her] part." [R. 19, p. 10]. Again, the Court finds this to be a mischaracterization of events. Gerlach's performance review, [R. 19–8], was conducted in accordance with Siemens' annual review period, which occurred in Fall 2019. [R. 18–4, p. 11, 38:2–18]. In preparation for the review period, the performance reviews had to be submitted to the "HR performance management system" prior to the beginning of August, which is the start time for "roundtable" discussions regarding employees' performance. *Id.* at 38:9 to 39:14. In submitting Gerlach's performance review–which by its very nature requires evaluation of an employee's *past* performance–Ferris was simply complying with Siemens' standard policy and timelines. The performance review did not prevent Gerlach from receiving her full bonus for the 2019 year, and Gerlach proffers no evidence to suggest that her FMLA leave was used against her in the review, or that the review contributed in any way to her termination. [R. 18–4, p. 12, 44:2–4]. In fact, in her deposition, Ferris testified that Gerlach's performance had no role in her termination. *Id.* at 5, 15:7–13. As a result, the performance review cannot be considered pretext for discrimination. *See Wojan v. Alcon Labs, Inc.*, No. 07–11544, 2008 U.S. Dist. LEXIS 69576, at *17–18 (E.D. Mich. Sep. 15, 2008) (quoting *LaCroix v. Sears*, 240 F.3d 688, 692 (8th Cir. 2000)) ("[A] negative review is actionable … where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's

employment."); *Reeves v. Case W. Res. Univ.*, No. 1:07–CV–1860, 2009 U.S. Dist. LEXIS 90308, at *51–53 (N.D. Ohio Sep. 30, 2009) (same).

Third, Gerlach asserts that a denial of her second request to work remotely in combination with "no position for [her] to return to when her FMLA leave was exhausted" illustrates "pure pretext." [R. 19, pp. 11–13]. The Court disagrees. Again, the decision that Gerlach could not work remotely occurred months *prior* to her FMLA leave in May 2019. [R. 18–2, Ex. 2, Siemens–001748]. It is true that in October 2019, Gerlach renewed her request to work from home for a second time, weeks after her FMLA leave had expired and still without submitting a "return to work" date or medical release form. [R. 18–2, 53:15 to 54:14; R. 18–3, p. 5, 13:13–18]. Siemens denied the request a second time, as it had done prior to Gerlach's FMLA leave, based on legitimate business reasons. [R. 18–2, 53:15 to 54:3; R. 18–2, Ex. 2, Siemens–001748]. In addition, there was "no position" for Gerlach to return to at the expiration of her FMLA leave because, due to her continuing disability, Gerlach never returned to Siemens post–FMLA leave. If, at the end of her FMLA leave in September 2019, Gerlach had complied with company policy and had been cleared to work, she would have been able to return to her position as Employee Engagement Leader. Indeed, in her deposition, Ferris stated that Gerlach's position did not become available (for others to apply for it) until after Gerlach's FMLA leave was exhausted and Gerlach failed to supply Lincoln with a "return to work" date and medical release form. [R. 18–4, p. 7, 25:9–13].

Because Gerlach was not cleared to work and because she never submitted a "return to work" date or medical release form to Lincoln, Siemens was within its right to release Gerlach's position. [R. 19–3, p. 6, 19:3–8]. Put differently, Gerlach's position at Siemens was offered to someone else due to Gerlach's continued absence post–FMLA leave, not because Ferris and/or

18

Whitlock worked to oust Gerlach out of her job for discriminatory reasons. In fact, any alleged animosity by Ferris towards Gerlach occurred *prior* to Gerlach taking FMLA leave. Whitlock testified that Ferris discussed Gerlach's performance issues with her months prior to Gerlach's request for FMLA leave. [R. 18–3, p. 10, 30:21–24, 32:6–10]. Whitlock also testified that any conversation between her and Ferris regarding Gerlach's performance played no role in Gerlach's termination. *Id.* at 9, 29:17–23.

Further, various other grounds alleged by Gerlach in support of her retaliation claim all occurred prior to her request for FMLA leave, and in any event, fail to demonstrate pretext. For example, Gerlach mentions an incident in November 2016, when she claims Ferris defamed her character by insinuating to coworkers that she was intoxicated at a work event. [R. 18–2, 236:3–11; 241:19 to 242:11]. This event not only occurred almost three years before Gerlach's 2019 FMLA leave but it is also based on speculation since Gerlach heard the alleged gossip from a third party and never addressed the issue with Ferris directly. *Id.* at 246:5–10. The Court also finds little support in the second event discussed by Gerlach. That event occurred in April 2019, months prior to Gerlach's FMLA leave, and, once again, involved Gerlach hearing from a third party that Ferris was discussing Gerlach with a coworker. *Id.* at 242:13–24. Due to the dated and speculative nature of these events, the Court will not construe them as evidence in support of Gerlach's claim that Ferris "was looking to get rid of [her]." [R. 19, p. 4]; *see also Grizzel*, 461 F.3d at 724.

Finally, Gerlach makes no argument that Siemens' proffered reasons for terminating her were "insufficient to motivate [Siemens'] action." *Tingle*, 692 F.3d at 400. Even if Gerlach had argued as such, the Court would be unconvinced. After almost a year of *various* types of leave, Gerlach failed to submit a "return to work" date and medical release form to Siemens in May

2020. [R. 18–4, p. 4, 11:12–16; R. 19–3, p. 3, 13:13–22]. Such circumstances would try even the most patient of employers, understandably generating the motivation to bring closure to the employment relationship.

### IV. Conclusion

The record, even construed in the light most favorable to Gerlach, does not support a claim for FMLA retaliation. Thus, for the reasons stated above, the Court will grant Siemens' Motion for Summary Judgment [R. 18]. Accordingly, **IT IS HEREBY ORDERED** as follows:

1. The Motion for Summary Judgment filed by Defendant Siemens Corporation **[R. 18]** is **GRANTED**.

This the 18th day of November, 2021.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY